UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RUBEN RHENWRICK,

        *Plaintiff*,

v.

UNITED PARCEL SERVICE, INC.

        *Defendant*.

No. 1:22-cv-00775

JURY TRIAL DEMANDED

## **COMPLAINT**

### **Introduction.**

UPS employee Michael Miller violently battered supervisor Ruben Rhenwrick by hitting his wrist, inflicting substantial pain and causing a large lump to appear on his hand. Rhenwrick's transgression: allowing his face mask to slip beneath his nose. Miller, who is White, committed his assault while at work and targeted Rhenwrick because he is Hispanic and Black. UPS knew Miller had a history of aggressive and racist misconduct committed against other UPS employees and even UPS customers. Nevertheless, UPS retained Miller as its employee. Because Rhenwrick was Hispanic and Black, and Miller was White, UPS decided to not discipline Miller for his violent attack, instead blaming Rhenwrick for not wearing his mask correctly and not deescalating Miller's violent aggressiveness. UPS's failure to prevent Miller's attack and failure to discipline him allowed for Rhenwrick's assailant to continue working for UPS, all of which created an unsafe and hostile work environment for Rhenwrick, forcing him to leave his employment for his own safety. UPS is responsible for Rhenwrick's damages by creating a hostile work environment based on his race, negligently retaining Miller, and Miller's battery.

**Jurisdiction, Venue, and Cause of Action**

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

2. This Court has personal jurisdiction over the Defendant as Defendant has purposefully availed itself of minimum contacts with the State of Indiana by engaging in business within Indiana, employing Indiana residents, and owning / leasing real estate in Indiana. This action arises from these minimum contacts.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

4. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e-5, and state law claims for negligent retention and battery.

5. Plaintiff has exhausted all conditions precedent to the filing of this Complaint. On January 20, 2022 the Equal Employment Opportunity Commission issued a Notice of Right to Sue and this action has been filed within ninety (90) days of receipt of said notice. See Exhibit 1.

**Parties**

6. Ruben Rhenwrick is a Hispanic and African-American adult male residing in the County of Johnson in the State of Indiana and at all relevant times herein was employed by UPS with the position of On-Road Supervisor until his employment terminated on May 27, 2021.

7. United Parcel Service, Inc., ("UPS") is an international corporation engaged in the practice of package delivery with its headquarters located at 55 Glenlake Parkway, Atlanta, Georgia, incorporated in the State of Delaware, and does business in the State of Indiana, including at one of its facilities located at 5431 West 81st Street, Indianapolis, Indiana, 46268.

UPS has a registered agent in the State of Indiana, namely Corporation Service Company, 135 North Pennsylvania Street, Suite 1610, Indianapolis, Indiana 46204.

8. Michael Miller is a Caucasian male who at all relevant times herein was also employed by UPS within the State of Indiana.

**Facts**

9. Plaintiff began working for UPS in July of 2019 as a seasonal driver.

10. Plaintiff progressed in his role with UPS to become an "On-Road Supervisor" where he was responsible for overseeing several UPS drivers in the field.

11. On May 10, 2021, Plaintiff was working in said role at the UPS facility located at 5431 West 81st Street in Indianapolis, Indiana.

12. At around 7:25p.m. Plaintiff was having a conversation with one of his employees, Geoffrey Quarles, in a hallway.

13. During Plaintiff's conversation with Mr. Quarles, another UPS employee, Michael Miller, interrupted Plaintiff and Mr. Quarles and in a very aggressive manner demanded Plaintiff "fix" his face mask.

14. Plaintiff recognized his face mask had slipped below his nose and was resting on his mustache, so, in an effort to diffuse this sudden aggressive altercation with Mr. Miller, Plaintiff complimented Mr. Miller on being aware of his surroundings.

15. Plaintiff immediately placed his mask above his nose hoping that would end this hostile encounter with Mr. Miller.

16. However, Mr. Miller maneuvered himself behind Plaintiff and in yet another aggressive manner yelled at Plaintiff, "Did you hear me, fix your mask! No, matter fact, what's your name?!"

17. Plaintiff was wearing his name badge that was clearly visible and identified himself.

18. Due to Mr. Miller's erratic and aggressive behavior, and fearing Mr. Miller may further escalate his unprovoked altercation, Plaintiff decided it would be best to remove himself from the situation so he ended his conversation with his employee and began walking away from Mr. Miller and towards the supervisor office upstairs on the second floor.

19. Mr. Miller followed Plaintiff.

20. As Mr. Miller was stalking Plaintiff, Mr. Miller yelled again, in an aggressive voice, "Ah, what's your name!?"

21. Plaintiff's fear of being physically assaulted intensified, especially due to Mr. Miller being a much larger person than Plaintiff.

22. Plaintiff was unaware who Mr. Miller was at the time given that Mr. Miller was wearing his face mask, dark sunglasses, a hat, and no visible name badge.

23. Plaintiff then turned around and, hoping to deter Mr. Miller's actions, asked him, "Are you the police or something?"

24. Mr. Miller respond by again yelling very aggressively, "No, I said what's your name?!"

25. Plaintiff responded by calmly asking for Mr. Miller to identify himself.

26. Mr. Miller responded, "I am not giving you my name because you never gave your name!"

27. Plaintiff then informed Mr. Miller that Plaintiff would take his picture in order to identify him.

28. Plaintiff took out his cell phone so as to take a photograph of Mr. Miller in an effort to identify him and report him for his inappropriate conduct.



29. Mr. Miller then battered Plaintiff by making violent and forceful contact with Plaintiff's hand that held the cell phone, knocking Plaintiff's phone to the ground and inflicting bodily harm upon Plaintiff's hand, causing personal injury and a very large, prominent bump on Plaintiff's injured right hand.



30. Plaintiff picked up his phone and again asked Mr. Miller to identify himself, but Mr. Miller, having just battered Plaintiff, began to walk away.

31. Plaintiff asked Mr. Miller again to identify himself but this time Mr. Miller responded that he was going to get his union steward.

32. Mr. Miller stalked, taunted, harassed, intimated, and assaulted Plaintiff in part because of Plaintiff's race.

33. Plaintiff went upstairs to the supervisor's office and informed the on-duty manager, Ebony Lewis, of what had just occurred.

34. Mrs. Lewis arranged for a meeting between her, Plaintiff, Mr. Miller, and Mr. Miller's union steward, Ray Hagger, that same day.

35. During said meeting, Plaintiff finally learned Mr. Miller's identity.

36. Mr. Miller falsely denied hitting Plaintiff.

37. Plaintiff then showed the photograph he had taken of Mr. Miller just before the attack and of Plaintiff's injured hand.

38. Mr. Miller then changed his story.

39. Mr. Hagger told Plaintiff that if Plaintiff had only wore his mask correctly than Plaintiff would not have been assaulted.

40. Plaintiff was taken aback by Mr. Hagger's statement and left the room and went to the supervisor office for his things.

41. Along the way, Plaintiff saw his co-workers Aaron Boyd and Nicolette Fraser, showed them his injured hand, and explained what had occurred.

42. Mr. Hagger then approached Plaintiff and apologized for Mr. Miller's assault of Plaintiff.

43. Mr. Hagger asked Plaintiff if Plaintiff would "just let this go."

44. Plaintiff then called and texted his supervisor, Vernon Leshore, and informed him of what had occurred.

45. Plaintiff then had UPS security escort himself to his car and left.

46. The following day, May 11, 2021, Plaintiff called his supervisor, Mr. Leshore, and explained that Plaintiff was still in pain and fearful of returning to work.

47. Mr. Leshore told Plaintiff that he would inform Plaintiff when Plaintiff would be able to come back to work.

48. Mr. Leshore expressed no concern for Plaintiff's condition or safety.

49. Plaintiff had worked with Mr. Leshore since the beginning of his employment with UPS and Plaintiff noticed how unusual it was for Mr. Leshore to be so short with Plaintiff.

50. Plaintiff later that day sent Mr. Leshore a statement about what occurred along with a photo from the incident.

51. That was the last time Plaintiff was able to speak with Mr. Leshore as Plaintiff would call or text him but received no response.

52. On May 12, 2021, the Head On Road Supervisor Manager, Chris Jones, called Plaintiff into his office at the Human Resources building.

53. Mr. Jones informed Plaintiff the incident with Mr. Miller was under investigation, obtained Plaintiff's statement, and told Plaintiff he would be notified when he could return to work.

54. Mr. Jones did not show any concern for Plaintiff's safety or wellbeing.

55. On May 19, 2021 Mr. Jones sent Plaintiff text message instructing him to return to work.

56. On May 20, 2021 Plaintiff returned to work and resumed his normal job duties.

57. On this same date, Plaintiff had a meeting with Mr. Jones at the Plainfield office.

58. Mr. Jones told Plaintiff that Plaintiff was a supervisor and was responsible for deescalating situations.

59. Mr. Jones told Plaintiff there was an issue with him taking a photograph in the locker room, but that Mr. Jones was glad Plaintiff did so, referencing it was good that Plaintiff had proof of what occurred.

60. Mr. Jones told Plaintiff that Mr. Miller was known to be a hostile employee.

61. Mr. Jones told Plaintiff that UPS does not "have to address or confront an annoying hostile person."

62. Mr. Jones told Plaintiff that unfortunately UPS "cannot fix every problem on the spot."

63. Mr. Jones told Plaintiff that "everybody knows how it happened" referencing Mr. Miller's physical attack of Plaintiff.

64. Mr. Jones told Plaintiff that Mr. Miller received no disciplinary action for assaulting Plaintiff and that Mr. Miller has returned to work.

65. Mr. Jones told Plaintiff something to the effect of "in today's day and age and political climate," in reference to why UPS was not disciplining its White employee, Mr. Miller, and refusing to protect its Black employee, Plaintiff.

66. Mr. Jones told Plaintiff that he, Mr. Jones, was "getting closer to retirement every day."

67. Mr. Miller has a history of being involved in workplace confrontations while working for UPS.

68. Mr. Miller has a history of being racist, confrontational, aggressive, and hostel with other UPS employees and UPS customers.

69. UPS was aware of Mr. Miller's history of repeated past misconduct and yet did not take action to protect its employees from Mr. Miller.

70. UPS chose not to protect Plaintiff because of Plaintiff's race.

71. On May 21, 2021 Plaintiff attended a regular weekly meeting with all the On Road Supervisors and On Road Supervisor Managers.

72. The supervisors expressed to the managers their concerns with how UPS handled the incident and not ensuring a safe work environment for everyone.

73. One of the supervisors told the supervisors and managers how Mr. Miller had already received a "last and final" write up from his most recent incident before battering Plaintiff.

74. The managers stated that should Mr. Miller do something again then that would be his "last and final" write up.

75. On May 25, 2021 Plaintiff filed a concern with UPS's human resources department regarding the incident.

76. Plaintiff never heard back from UPS regarding said concern.

77. Plaintiff was made to be subjected to a barrage of embarrassing and humiliating text messages and phone calls from colleagues about what had occurred, how he had been attacked and UPS did not care, and his attacker was allowed back to work; so many people were reaching out to Plaintiff that he had to change his telephone number.

78. Plaintiff was embarrassed, degraded, and humiliated that another UPS employee could physically attack him and suffer no consequences, and that UPS employees continued to talk

with him about the incident and how Mr. Miller suffered no consequences. To date, anytime Plaintiff encounters UPS employees in daily life, the incident is brought up, and Plaintiff has t relive the negative emotions and impact.

79. Plaintiff was also scared and afraid for his physical safety while working at UPS given that he had just been physically attacked, UPS failed to hold the perpetrator accountable or take action to protect him, and his attacker continued to work for UPS.

80. Consequently, Plaintiff was forced to resign from UPS on May 27, 2021

**Count I**
**Title VII - Race Discrimination**

81. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth at length herein.

82. UPS subjected Plaintiff to a hostile working environment based on his race, as detailed above.

83. The hostile work environment was severe based on the nature of the physical attack, UPS's knowledge of Mr. Miller's prior confrontations and misconduct, including those regarding race, and UPS's failure to remedy the immediate physical safety concerns of Plaintiff.

84. Plaintiff considered the aforementioned conduct discriminatory and reported such conduct, both verbally and in writing, to numerous management level employees of UPS.

85. UPS was fully aware of the hostile work environment.

86. Rather than ensure a safe workplace and cease the hostile work environment, UPS permitted such to continue, constructively terminating Plaintiff from his employment with UPS.

87. Accordingly, UPS's discriminatory acts have deprived Plaintiff of equal employment opportunities because of his race in violation of Title VII.

88. As a direct and proximate result of the aforesaid unlawful discriminatory employment practices engaged in by UPS in violation of Title VII, Plaintiff sustained damages, including personal and physical injury to his hand, pain and suffering, mental anguish, loss of employment, lost earnings, lost earning potential, emotional distress, embarrassment, humiliation, and loss of self-esteem.

## Count II
## Negligent Retention

89. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth at length herein.

90. UPS negligently retained Mike Miller, it's employee, who UPS knew was in the habit of misconducting himself as Mr. Miller had a documented history of engaging in prior misconduct, at least in part involving racist and/or aggressive actions against UPS employee(s) and UPS customer(s).

91. As a direct and proximate result UPS's negligent retention of Mike Miller, Plaintiff sustained damages exceeding $75,000, including personal and physical injury to his hand, pain and suffering, mental anguish, loss of employment, lost earnings, lost earning potential, emotional distress, embarrassment, humiliation, and loss of self-esteem.

## Count III
## Battery

92. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth at length herein.

93. UPS's employee, Michael Miller, committed a battery against Plaintiff by knowingly or intentionally touching Plaintiff against his will in a rude, insolent, or angry manner.

94. Mr. Miller's battery of Plaintiff was committed within the course and scope of his employment with UPS and was done in part to further UPS's business interests by enforcing its rules or policies regarding the wearing of face masks during the covid-19 pandemic and/or to enforce UPS's rules or policies preventing the taking of photographs in portions of the UPS building.

95. As a direct and proximate result Mr. Miller's and UPS's battery of Plaintiff, Plaintiff sustained damages exceeding $75,000, including personal and physical injury to his hand, pain and suffering, mental anguish, loss of employment, lost earnings, lost earning potential, emotional distress, embarrassment, humiliation, and loss of self-esteem.

**Prayer for relief**

WHEREFORE, Plaintiff requests this Court enter judgment in his favor and against Defendant, and order that Defendant compensate for Plaintiff for all his damages, costs, attorney fees, and all other relief as is deemed just and proper.

**Jury demand**

96. Plaintiff demands trial by jury.

RESPECTFULLY SUBMITTED:

TAYLOR-PRICE LAW, LLC
/s/   Christopher Taylor-Price
Attorney No. 34741-49
1350-C Southport Rd. No. 101
Indianapolis, IN 46217
chris@taylorprice.law | 317.883.9285